FILED IN UNITED STATES DISTRICT COURT, DISTRICT OF UTAH

JAN 27 2010

D. MARK JONES, CLERK

BY _____ DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br>Plaintiff,<br><br>v.<br><br>Luis A. Rodriguez-Lara<br>Defendant. | REPORT AND RECOMMENDATIONS<br><br>2:08-CR-00860-DAK |

Before the court is a Motion to Suppress submitted by Defendant, Luis A. Rodriguez-Lara. (File Entry #26.) After thorough review and consideration of the testimony and evidence presented at the evidentiary hearing and the parties' pleadings, the court recommends that Defendant's Motion to Suppress be denied.[1]

## FACTUAL BACKGROUND

Utah Highway Patrol Trooper Nick Bowles testified that he has nine years of experience as a trooper and has conducted more than 9,000 traffic stops. (Transcript of 7/20/2009 Evidentiary Hearing at 4.) Trooper Bowles estimated that those traffics stops

---

[1] As the prosecution noted, Defendant's Memorandum was not timely filed. The evidentiary hearing in this matter took place July 20, 2009; at the hearing, the Court ordered defendant's supporting memorandum filed within twenty-one days of the transcript becoming available. Transcripts of the hearing were filed on August 26, 2009. On October 19, 2009, fifty-five days after the transcript became available, the Court scheduled a status conference. At that conference defendant requested another twenty days to file his Memorandum. Defendant eventually filed his Memorandum on November 19, 2009--more than thirty days after the status conference and over eighty days after the transcript first became available. Unapproved delays are not acceptable. Rather than penalize the defendant however, this court notes that any future delays of this type will jeopardize counsel's ability to be appointed on future CJA cases.

include nearly seventy significant drug or currency seizures. (Id. at 4-5.)

On November 23, 2008, Trooper Bowles patrolled Interstate 70 in Sevier County. (Id. at 5.) He was parked in the median near milepost 57 at approximately 10:00 a.m. (Id.) on a clear November day. His attention was drawn to a red Chevy pickup truck--with "extremely dark tinted windows"--as it passed his location. (Id. at 5-6.) Because the front window tint appeared to be in violation of Utah law, Trooper Bowles initiated a traffic stop and approached the vehicle. (Id. at 6.)

He contacted the driver, defendant Luis Rodriguez-Lara, and detected a strong, soapy odor coming from the vehicle. (Id. at 5-6.) Trooper Bowles said he took note of the uncommon odor because his criminal interdiction experience taught him that soap is sometimes used to mask narcotics. (Id. at 6-7.) The trooper also noticed an unoccupied child safety seat in the pickup and observed that defendant was nicely dressed. (Id. at 6.)

Trooper Bowles requested defendant's driver's license and registration. (Id. at 7.) Defendant provided Mexican identification and the truck's registration, claiming that the vehicle belonged to his friend. (Id.) When asked about his travels, defendant claimed he was returning home to Grand Junction, Colorado, after visiting Los Angeles, California. (Id.)

Trooper Bowles asked Defendant to join him in his patrol car while he did paperwork relative to the stop. (Id.) The trooper intended to issue a written warning to defendant for the window tint violation. (Id. at 8.)

The trooper testified that the defendant was not free to leave while he was in his vehicle and that he did not give him *Miranda* warning at this time. Tr. at p. 29. He further testified that Rodriguez-Lara was detained for the purpose of a traffic stop. Tr. at p. 30.

Reviewing the registration paperwork, the trooper discovered that--despite defendant's claim that the vehicle belonged to a friend--it had actually been registered in the defendant's name just three days prior to the traffic stop. (Id. at 7, 11.)

While waiting for dispatch information, Trooper Bowles completed the written warning and spoke with the defendant about his travels, his family, and his employment. (Id. at 8-9.) The trooper took note of defendant's claim that he drove alone from Colorado to California for a two-day visit. (Id. at 9.) In his experience, Trooper Bowles said he had found that long-distance road trips taken alone for brief stays are unusual, except that such behavior is consistent with trafficking illegal drugs. (Id.)

Trooper Bowles also noticed that defendant, who claimed to be a landscaper by trade, had an appearance inconsistent with typical landscapers. (Id. at 9-10.) Specifically, he said defendant's hands were very clean and smooth, lacking callouses and other signs of landscaping work. (Id.) Defendant was also nicely dressed, wearing a collared dress shirt under an argyle-type sweater, (Id. at 25-26.); in the trooper's experience this varied from the typical style of dress for both landscapers and those traveling cross-country by car. (Id. at 9-10, 25-26.)

After issuing the warning and returning the identification and other documents to the defendant, Trooper Bowles "said some sort of goodbye." (Id. at 12.) Defendant then asked the trooper about what he needed to do with the window tint. (Id.) Trooper Bowles explained it needed to be lighter; defendant, after thanking the trooper, exited the patrol car. (Id.) Defendant returned to his own vehicle and, as he was opening the door, Trooper Bowles asked if he could talk further with the defendant. (Id. at 14.) The

defendant walked back toward the trooper. (Id.) Trooper Bowles again asked if he could talk with defendant and defendant agreed to do so. (Id. at 14-15.)

Trooper Bowles said he had observed some things out of the ordinary and asked if the defendant was doing anything illegal. (Id. at 15.) Defendant denied doing anything illegal. (Id.) When specifically asked whether there were drugs or weapons in the vehicle, the defendant said "no." (Id.) During this conversation, defendant (while gesturing toward the truck) twice offered to allow Trooper Bowles to check. (Id.) Trooper Bowles then directly asked defendant for permission to search the vehicle, and defendant "shook his head up and down in a yes motion." (Id.) While Trooper Bowles spoke with defendant on the side of the road, he was the only officer on scene. (Id. at 16.) The trooper said he did not draw his weapon, touch defendant, raise his voice, or use a commanding or threatening tone. (Id.)

After gaining defendant's consent, Trooper Bowles searched the vehicle. (Id.) He then conducted a systematic search of the vehicle, found nothing of interest, and asked the defendant about the laundry soap. (Id. at 17-18.) Trooper Bowles held the soap box up, showed it to the defendant, and asked if he could open it. (Id. at 18.) Unsure if the defendant heard him clearly, Trooper Bowles again asked defendant if he could open the soap. (Id. at 18-19.) In response, defendant said, "sure." (Id.)

Trooper Bowles took the soap to the tailgate of the defendant's truck and began to open it. (Id. at 19.) He found the lid had been glued down unusually well. (Id.) Once opened, the trooper ran a tool through the soap and struck a hard object. (Id. at 19-20.) He then removed a plastic bag containing two packages. (Id. at 20-21.) The trooper later performed field tests on those packages and said the larger one tested positive for

methamphetamine and the smaller package positive for heroin. (Id. at 21.) Trooper Bowles arrested the defendant. (Id.)

## ANALYSIS

Defendant argues the evidence against him in this case should be suppressed for three reasons: 1) Trooper Bowles impermissibly extended the scope of the traffic stop; 2) Trooper Bowles improperly questioned the defendant without advising him of his rights under Miranda v. Arizona; and 3) defendant did not, in fact, consent to the search of his vehicle.

### I. Trooper Bowles did not impermissibly extend the scope of the traffic stop.

#### A. Defendant was not detained when questioned by Trooper Bowles about additional illegal activity.

"The Fourth Amendment proscribes unreasonable searches and seizures; it does not proscribe voluntary cooperation." Florida v. Bostick, 501 U.S. 429, 439 (1991). As the Supreme Court made clear in INS v. Delgado, 466 U.S. 210, 216-17 (1984),

> [P]olice questioning, by itself is unlikely to result in a Fourth Amendment violation. While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response. Unless the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded, one cannot say that the questioning resulted in a detention under the Fourth Amendment.

The subjective belief of the defendant is not the proper focus; the correct test, examines whether a reasonable person in the defendant's position would believe he was not free to leave. Id. at 1499.

The Tenth Circuit, in United States v. Torres-Guevara, 147 F.3d 1261, 1264 (10th Cir. 1998) set forth some factors to be considered in cases such as the one at hand:

(1) whether the encounter occurred in a confined or nonpublic space, (2) if the officers confronting the subject were armed or uniformed, (3) the number of officers confronting the subject, (4) whether the officers exhibited an intimidating or coercive demeanor, and (5) whether the officers asked the subject potentially incriminating questions.

With respect to the fifth factor listed, the Tenth Circuit "has made clear that the mere fact that officers ask incriminating questions is not relevant to the totality-of-the-circumstances inquiry--what matters instead is 'the manner' in which such questions were posed." United States v. Ringold, 335 F.3d 1168, 1173 (10th Cir. 2003) (quoting United States v. Little, 60 F.3d 708, 712 (10th Cir. 1995)).

Although armed and in uniform, Trooper Bowles made his request for further questioning on the side of a public roadway. No other officers were present and Trooper Bowles exhibited neither coercive nor intimidating behavior. And, although the defendant may have been concerned by the nature of the questions posed by Trooper Bowles, there is no evidence suggesting that he posed the questions in an accusatory, persistent, or otherwise intimidating manner.

United States v. Villegas, 554 F.3d 894 (10th Cir. 2009), is particularly instructive given certain factual similarities to the present case. In Villegas, a Utah trooper stopped a vehicle for a tint violation and lane travel violation. (Id. at 897.) The trooper invited the driver to his car and questioned him while completing a written warning. (Id.) After issuing the warning, the trooper returned the driver's documents and indicated he could leave, saying something to the effect of, "have a good day." (Id.) The defendant opened the patrol car door and, as he began to exit the vehicle, the trooper stopped him and requested permission to further question the defendant. (Id.) As he made the request, the trooper gestured with his left hand. (Id.) Defendant agreed to further questioning and sat

back down in the patrol vehicle. (Id.) After asking whether there was any illegal contraband in the vehicle, the trooper sought permission to search the car. (Id. at 897-98.) Defendant consented and troopers found five packages of controlled substances during the search. (Id. at 898.)

On appeal, defendant Villegas argued that the district court erred in denying his motion to suppress evidence. (Id.) Specifically, the defendant alleged that consent to search his car was not given voluntarily because he was compelled to stay in the vehicle by the trooper's hand gesture, which he interpreted as a command to halt. (Id.)

The Tenth Circuit found defendant's arguments unpersuasive and affirmed the denial of the motion to suppress. (Id. at 899.) After accepting the district court's view that the hand gesture was inconsequential and vague, the Tenth Circuit ruled that the defendant's consent to further questioning was voluntary despite the fact that he had not completely exited the patrol car when the trooper made the request and although more than one trooper was on-scene. (Id. at 898-99.) The court gave particular weight to the district court's finding that the trooper "was polite and pleasant as he made the request." (Id. at 899 (internal citation omitted).)

The facts in this case weigh in favor of valid consent even more than those in Villegas. More than merely opening the patrol car door, Mr. Rodriguez-Lara exited the trooper's car and was opening the door to his own vehicle at the time Trooper Bowles asked if he could talk further. The encounter took place on the side of a public roadway by a single officer who did not exhibit an intimidating manner or otherwise coerce the defendant. Of particular significance to this court is the fact that defendant volunteered

permission for Trooper Bowles to search his vehicle twice before being directly asked for consent to search.

The evidence establishes that the traffic stop ended and the defendant agreed to voluntarily cooperate with Trooper Bowles afterward. Because defendant was objectively free to leave or to refuse further cooperation, he was not seized for purposes of the Fourth Amendment.

**B. Even if defendant were detained, Trooper Bowles had reasonable suspicion of criminal activity.**

Even if this Court were to find that defendant was seized under the Fourth Amendment at the time he consented to a search, Trooper Bowles had reasonable suspicion to question defendant about whether he was involved in drug trafficking. The law clearly establishes that a police officer may detain a driver for additional questioning unrelated to the original stop if the officer has an objectively reasonable and articulable suspicion of illegal activity. See e.g., United States v. Soto, 988 F.2d 1548, 1554 (10th Cir. 1993); cf. United States v. Walker, 933 F.2d 812, 817 (10th Cir. 1991).

In assessing whether Trooper Bowles could have formed a reasonable and articulable suspicion of criminal activity, the Court must base decisions not on any one factor, but on the "totality of the circumstances." United States v. Jones, 44 F.3d 860, 872 (10th Cir. 1995). In assessing reasonable suspicion, courts must also defer to trained law enforcement personnel and their "ability to distinguish between innocent and suspicious circumstances." United States v. Mendez, 118 F.3d 1426, 1431 (10th Cir. 1997).

The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated

certain common-sense conclusions about human behavior; jurors as fact-finders are permitted to do the same–and so are law enforcement officers. . . . [T]he evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement. Trained officers aware of the modes and patterns of operation of certain kinds of lawbreakers can draw inferences and make deductions that might well elude untrained persons.

Id. (citing United States v. Cortez, 449 U.S. 411, 418 (1981)). In assessing reasonable suspicion, an officer is allowed "to draw on [his] own experience and specialized training to make inferences from and deductions about the cumulative information available to [him] that might well elude an untrained person." United States v. Arvizu, 534 U.S. 266, 273 (2002). "The evaluation is made from the perspective of the reasonable *officer,* not the reasonable *person.*" United States v. Quintana-Garcia, 343 F.3d 1266, 1270 (10th Cir. 2003) (emphasis original).

Based on the totality of the circumstances, Trooper Bowles had reasonable suspicion that defendant was engaged in criminal activity prior to asking permission to talk further with defendant:

1. Masking odor. The Tenth Circuit has consistently held that "a strong odor may give rise to reasonable suspicion on the part of law enforcement officials that the odor is being used to mask the smell of drugs." United States v. Salzano, 158 F.3d 1107, 1114 (10th Cir. 1998); see United States v. Villa-Chaparro, 115 F.3d 797, 801 (10th Cir. 1997) (odor of soap and visible soap crystals contributed to reasonable suspicion); United States v. Hernandez-Rodriguez, 57 F.3d 895, 898 (10th Cir. 1995) (strong smell of perfume supported reasonable suspicion it was used as masking odor). And as Trooper Bowles testified, "The majority of time when I smell a soapy odor in a vehicle, I've found narcotics." (Tr. at 31.)

2. Deceptive answers. Defendant clearly lied about vehicle ownership, attempting to distance himself from the truck by claiming it belonged to a friend when, in reality, it had been registered in defendant's name just three days prior. (Tr. at 7, 11.) Trooper Bowles expressed doubts about defendant's later claims regarding his occupation as a landscaper based on his cleanliness and his apparel, but this court does not share those concerns to the degree the trooper did. Landscapers are entitled to clean up, and landscapers are entitled to wear non-work clothes when they go on trips just like troopers and judges do. However, the fact that the defendant lied about something that would be fresh on his mind like getting ownership of a car three days earlier *is* of significance. This deceptive answer, when coupled with other suspicious behaviors, can give rise to reasonable suspicion. See, e.g., United States v. Carhee, 27 F.3d 1493, 1497-98 (10th Cir. 1994); United States v. Moore, 22 F.3d 241, 243 (10th Cir. 1994).

3. Unusual travel plans. Defendant claimed he drove from Colorado to Los Angeles alone for a two-day visit with his parents. (Tr. at 8-9.) Trooper Bowles found it odd that defendant would make such a long drive alone for such a short stay; in his experience such trips are consistent with drug trafficking. (Id. at 9.) "[U]nusual travel plans may provide an indicia of reasonable suspicion." United States v. Wood, 106 F.3d 942, 946-47 (10th Cir. 1997); see also United States v. Sokolow, 490 U.S. 1, 9 (1989). While the nature of defendant's travel plans is not highly unusual, when coupled with defendant's lie about vehicle ownership and the presence of a masking odor, it is a factor, based on the trooper's experience, giving rise to reasonable suspicion.

The court notes that Trooper Bowles believed the empty child car seat was placed in the car by defendant as a "disclaimer" in hopes of relieving suspicions. (Tr. at 43.)

The court is not so persuaded. As defendant notes, Rodriguez-Lara stated to Trooper Bowles that he had a newborn child who was only one month old. This explanation is wholly plausible as the reason why his wife and child were not accompanying him on the drive to and from Los Angeles, California.

Considered in their totality, these factors combined to give Trooper Bowles–in light of his training and experience--reasonable suspicion to believe defendant was engaged in illegal activity. Trooper Bowles was not required to ignore those factors, and his "inquiry about drugs accounted for but a moment of defendant's brief detention and was based upon specific and articulable facts and rational inferences." United States v. Espinosa, 782 F.2d 888, 891 (10th Cir. 1986).

## II. Trooper Bowles was not required to advise defendant of his *Miranda* rights.

Defendant claims Trooper Bowles violated his rights as set forth in Miranda v. Arizona, 382 U.S. 436 (1966), by questioning him about his employment and travel plans and later about whether he had contraband in his vehicle. During both periods of questioning, however, Miranda was inapplicable.

Miranda "stands for the well-known proposition that a suspect in custody has a constitutional right under the Fifth Amendment to remain silent." United States v. Alexander, 447 F.3d 1290, 1294 (10th Cir. 2006). And, although Miranda provides for certain procedural safeguards regarding custodial interrogation, "two requirements must be met before Miranda is applicable; the suspect must be in 'custody,' and the questioning must meet the legal definition of 'interrogation.'" United States v. Perdue, 8 F.3d 1455, 1463 (10th Cir. 1993).

With respect to the first requirement, "the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." <u>California v. Beheler</u>, 463 U.S. 1121, 1125 (1983) (quoting <u>Oregon v. Mathiason</u>, 429 U.S. 492, 495 (1977)). While defendant relies on a Second Circuit opinion to imply he was in custody once Trooper Bowles activated his overhead emergency lights, the United States Supreme Court stated plainly that "[t]he . . . noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of Miranda." <u>Berkemer v. McCarty</u>, 468 U.S. 420, 440 (1984) (quotation in original).

As for the second requirement, "the term 'interrogation' under <u>Miranda</u> refers not only to express questioning, but also to any words or actions . . . reasonably likely to elicit an incriminating response from the suspect." <u>Rhode Island v. Innis</u>, 446 U.S. 291, 301 (1980) (footnotes eliminated).

When Trooper Bowles first questioned defendant during the course of a routine traffic stop, he was not "in custody" for purposes of <u>Miranda</u> and questions asked about his employment and travel plans clearly did not constitute "interrogation."

When Trooper Bowles later asked defendant about whether he was transporting weapons, drugs, or anything else illegal, defendant was likewise not "in custody." Those questions were posed during a consensual encounter; even if the Court were to find defendant was detained, however, the detention lacked any restraint approximating formal arrest. See <u>Beheler</u>, 463 U.S. at 1125. Defendant was simply not in custody for purposes of <u>Miranda</u> until he was arrested--and he was not arrested until after the vehicle search revealed suspected drugs.

### III. Defendant clearly gave voluntary consent for Trooper Bowles to search his vehicle.

It is well settled that the Fourth Amendment prohibits warrantless searches unless they fall within certain well established exceptions to the warrant requirement. Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) (quoting Katz v. United States, 389 U.S. 347, 357 (1967)). "It is equally well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." Id. (citing Davis v. United States, 328 U.S. 582, 593-94 (1946)).

The Tenth Circuit Court of Appeals analyzes consent issues by examining the totality of the circumstances surrounding the consent, with no presumption concerning the voluntariness or involuntariness of the consent. See, e.g., United States v. Price, 925 F.2d 1268, 1270 (10th Cir. 1991); United States v. Soto, 988 F.2d 1548, 1557 (10th Cir. 1993). The burden is on the government to establish voluntariness of a consent to search by demonstrating that (1) the consent was unequivocal, specific, freely and intelligently given, and (2) that the consent was not the product of duress or coercion. See, e.g., United States v. Orrego-Fernandez, 78 F.3d 1497, 1505 (10th Cir. 1996).

Defendant challenges the validity of his consent with respect to two related points. First, defendant argues that nodding his head affirmatively in response to a request to search was insufficient to constitute consent. Second, defendant asserts that because he was not fluent in English and had limited experience with the laws (and law enforcement officers) of the United States, he did not intelligently waive his right to refuse consent.

**A. Defendant freely and intelligently gave Trooper Bowles unequivocal, specific consent to search both his vehicle and the laundry detergent box.**

While defendant claims that "[a] nod of the head is not a sufficient or intelligent waiver," (def. mem. at 17), he nevertheless admits that the "nodding of his head may be considered implied consent to articulate his acceptance of waiving his constitutional right to be free from unreasonable searches." (Id. at 16.) Moreover, other evidence shows he gave Trooper Bowles unequivocal consent to search both his vehicle and the laundry detergent box.

After the conclusion of the traffic stop, defendant agreed to further questioning by Trooper Bowles. (Tr. at 14-15.) When Trooper Bowles asked if the defendant had anything illegal in his vehicle, the defendant said he did not. (Id. at 15.) Defendant then offered to let the trooper check his vehicle. (Id.) As he did so, defendant gestured toward his truck. (Id.) Trooper Bowles then specifically asked about weapons or drugs and defendant, denying he had any such items in the vehicle, again offered to let the trooper check. (Id.) While the defendant had already volunteered consent twice, Trooper Bowles nevertheless asked directly if he could search defendant's truck. (Id.) In response, defendant nodded his head up-and-down, so the trooper clarified by asking whether it was okay for him to search. (Id.) Defendant again nodded his head affirmatively. (Id.)

While the "nodding of his head may be considered implied consent" by the defendant, (see def. mem. at 16), two instances of defendant nodding his head--after defendant already volunteered consent to search his truck twice--left Trooper Bowles with no doubt that the defendant clearly consented to a vehicle search. (Tr. at 15.)

Furthermore, even if there had not been unequivocal consent to search defendant's vehicle, Trooper Bowles received defendant's specific consent to open and search the

laundry detergent box that contained illegal drugs. After performing a systematic vehicle search, Trooper Bowles returned to a sealed box of laundry detergent that had previously caught his attention. (Tr. at 18.) The trooper held the box up so that defendant could see it and asked if he could open it. (Id.) Unsure if the defendant clearly heard his request, Trooper Bowles asked again. (Id. at 18-19.) Defendant responded, "Sure." (Id.) Thus, defendant freely gave the trooper specific consent to open the laundry detergent box.

As to defendant's assertion that he did not speak English fluently, the critical point is not whether he spoke fluent English but instead whether he understood English sufficiently to provide knowing consent to search. See United States v. Sanchez-Valderuten, 11 F.3d 985, 990-91 (1993).

The court has viewed the DVD of the stop and listened to the dialogue between the officer and the defendant. While English is clearly not defendant's primary language, he is able to intelligently converse with the officer and directly answer his questions during their conversations.

The video recording of the traffic stop also demonstrates that defendant understood the trooper's request to search his vehicle, particularly when defendant volunteers consent to search before being asked directly. (See Video at 10:08 hrs.) When being questioned about whether his vehicle contained contraband, defendant obviously understood the trooper's questions and concerns and responded by volunteering to let the trooper search his truck. (Id.) Moreover, after obtaining consent to search, Trooper Bowles asked defendant to go stand about twenty-feet in front of his truck; defendant complied without requiring further explanation or clarification of the request. (id. at 10:09 hrs.).

The uncontradicted evidence before the Court makes clear that, viewed in the totality of the circumstances, defendant intelligently and freely gave unequivocal, specific consent for Trooper Bowles to both search his truck and to open the box of laundry detergent.

**B. Defendant was neither coerced nor under duress when he granted Trooper Bowles consent to search both his vehicle and the laundry detergent box.**

Defendant suggests that because he was unlawfully detained after the traffic stop ended, his consent was not voluntary. As shown in Part A.1 above, defendant was not detained at the time he granted consent for Trooper Bowles to search his vehicle.

Even if defendant were detained, however, his detention was not unlawful. (See Part A.2 supra.) Also, "[m]erely because a person is detained or in custody does not preclude voluntary consent." United States v. Manuel, 992 F.2d 272, 275 (10th Cir. 1993) (citing Florida v. Royer, 460 U.S. 491, 501 (1983)). Indeed, a valid consent to search may be given by a person who is being detained, United States v. McRae, 81 F.3d 1528 (10th Cir. 1996); United States v. Soto, 988 F.2d 1548 (10th Cir. 1993), and it has been long established that subjects need not know or be told that they may refuse to give consent in order for consent to be valid. Schneckloth v. Bustamonte, 412 U.S. 218, 248-49 (1973).

When viewed in the totality of circumstances, the evidence in this case compels the conclusion that defendant's consent to search his truck was given voluntarily rather than a product of duress or coercion.

## RECOMMENDATION

Based on the foregoing analysis, **IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress evidence seized during the search of Defendant's vehicle (File Entry #26) be DENIED.

Copies of the foregoing report and recommendation are being mailed to the parties who are hereby noticed of their right to object to the same. The parties are further notified that they must file any objections to the report and recommendation, with the clerk of the district court, pursuant to 28 U.S.C. Section 636(b), within ten (10) days after receiving it. Failure to file objections to both factual and legal findings may constitute a waiver of those objections on subsequent appellant review.

DATED this 27th day of Jan of 2010.

BY THE COURT:

_____
ROBERT T. BRAITHWAITE
U.S. Magistrate Judge